UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 20-cr-10029-DJC |
| SETH M. BOURGET and | ) | |
| JOSEPH M. LAVORATO | ) | |
| | ) | |
| Defendants. | **)** | |

<u>GOVERNMENT'S MEMORANDUM ON EXPERT TESTIMONY</u>

The United States respectfully submits the following memorandum pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) regarding the testimony it will seek to introduce pursuant to Federal Rule of Evidence 702.

<u>Summary of Expected Testimony</u>

Out of the five witnesses summarized below, only one, Mr. Donald Leach, is squarely an expert under Fed. R. Evid. 702.  The remaining witnesses, Michael Bollinger (a former U.S. Bureau of Prisons ("BOP") Captain responsible for use of force training) Michael Segal (the Assistant Warden at FMC Devens), Dr. Brett Dodd (a Staff Psychologist) and Dr. Batool Kazim (a Staff Psychiatrist) were each a percipient witness to relevant aspects of the case and will primarily provide testimony under Rule 701, rationally based on their own perceptions. Nonetheless, because portions of their testimony may include "specialized knowledge" under Fed. R. Evid. 702, and "the line between expert testimony under Fed.R.Evid. 702 and lay opinion testimony under Fed.R.Evid. 701 is not easy to draw," <u>United States</u> v. <u>Colon Osorio</u>, 360 F.3d 48, 52–53 (1st Cir. 2004); <u>see also</u> <u>United States</u> v. <u>Ayala-Pizarro</u>, 407 F.3d 25, 28 (1st Cir. 2005 <u>see also</u> John W. Strong, et al., McCormick on Evidence § 13, at 24 (5th ed.1999) ("the issue is whether the witness is more competent to draw the inferences than the lay jurors and judge"), the government is submitting this notice out of an abundance of caution.

Donald L. Leach, II

Mr. Donald Leach is a private consultant and former corrections administrator with almost 30 years of experience in corrections.  Mr. Leach has previously testified as an expert in acceptable correctional practices, administration, and supervision as well as the proper use of force in correctional facilities.  As detailed in the attached résumé and Expert Report,[1] Mr. Leach has the necessary qualifications, experience, and specialized knowledge to testify as an expert.

Mr. Leach was not involved in the investigation that led to the indictment.  Instead, his testimony will be based on his review of numerous materials[2], including the multiple videos from the June 18, 2019 use of force incidents, witness statements, and BOP policies.  In July 2021, Mr. Leach also had the opportunity to personally tour and examine the relevant locations at FMC Devens.

In sum, using reliable principals and methods derived from his experience, relevant research, review and analysis of materials, and a site visit, Mr. Leach will testify that the use of force on inmate KT on June 18, 2019 including defendant Bourget's use of the shield on inmate KT was not an acceptable use of force and was inconsistent with modern correctional standards and the BOP's use of force policy.[3]

Michael Bollinger

Until his retirement in August 2019, Bollinger worked for BOP for 33 years with 20 years at FMC Devens.  Bollinger is now self-employed as the CEO of Correctional Personnel Training,

---

[1]See Exhibit A (Leach resume) and B (Expert Report).
[2]The materials Leach reviewed are detailed started at page 7 of the report, Exhibit B.  See Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.")
[3]Exhibit B, pgs. 16, 39.  As Mr. Leach explains in his report, an "acceptable correctional practice," rather than a best practice, "refers to how objectively reasonable correctional professionals perform or should perform their duties based on legal policy codified and adopted into policy and procedure that is published, trained, and supervised.  See pg. 17.

LLC.[4]   After becoming a Captain in 1998, Bollinger was designated as a Subject Matter Expert ("SME") on the use of force and was responsible for training correctional officers and the entire staff on the proper use of force.  As a Lieutenant and a correctional officer, Bollinger was also involved in numerous instances where he and other correctional officers employed force.  Prior to the incident, Bollinger's most recent training on use of force took place in February 2019 and both Bourget and Lavorato attended.

From his 33 years of experience, including 20 years as a trainer and a SME on the use of force, Bollinger is knowledgeable about BOP use of force policies.[5]  Bollinger's testimony will include the points he made during his training sessions, including a discussion about five different levels of force (the "use of force continuum" depicted in a pyramid graphic), the documentation that BOP requires for each use of force, and the After-Action Review that follows.

Part of Bollinger's testimony will include how he instructed BOP correctional officers on the proper use of a shield in a use of force situation.  In sum, Bollinger will testify that while a shield can be used as protection to block spit or blood that an inmate is directing toward an officer, the shield cannot be used as a weapon when the inmate is not assaultive.  Bollinger will further testify that he never instructed nor condoned the use of a shield to strike an inmate especially in the neck or head area.  As a Lieutenant, in situations like inmate KT's refusal to lay down during the June 18, 2019 incident, Bollinger instructed his use of force team to go and grab a hold of the inmate because that is the least amount of force necessary to control that situation.[6]  Unless the inmate is

---

[4]Correctional Personnel Training, LLC specializes in training corrections personnel on various issues including on training on the management of dementia in aging inmates.
[5]The materials that the government produced regarding Bollinger's use of force training included a PowerPoint presentation, an outline/script of the training, and sign-in sheeting indicating that both Bourget and Lavorato attended the training in February 2019.  *See* USAO_BOURGET_000647 to USAO_BOURGET_000753.
[6]In addition to an interview report, training materials, and emails, along with this memorandum, the government has also disclosed Bollinger's grand jury testimony in which he relates this testimony.

combative, there is no need to plow the inmate into a wall.

Bollinger's duties and responsibilities also included the review of each use of force to ensure correctional officers and staff were complying with his training and BOP use of force policies so he could take corrective measures.  From this perspective, Bollinger (along with Assistant Warden Michael Segal described below) will provide testimony about the documentation required for each use of force and the After-Action Review process at BOP and FMC Devens.

While Bollinger was not at FMC Devens on the day of the incident, it was Bollinger's responsibility to review each use of force, and he began reviewing some of the videos from the use of force on inmate KT days later on June 21, 2019.  After reviewing the videos, Bollinger contacted Special Investigative Services ("SIS") to ensure the surveillance videos of the incident were maintained.  Bollinger also went to see inmate KT, saw that he was still bruised, and looked like "he got the sh*t kicked out of him."  In addition, prior to the incident, Bollinger was also involved in the management of inmate KT's transfer from N-1 (the fully locked down mental health unit) to N-3 (the semi-locked down mental health unit).  As a Captain, Bollinger was in the chain of command and was aware of the difficult nature of KT's condition.

<u>Michael Segal</u>

In June 2018, Segal was the Assistant Warden at FMC Devens.  On the night of the incident on June 18, 2019, he was the Acting Warden.  Segal began his career BOP in 2003,[7] and is currently the Warden at Federal Correctional Institution ("FCI") Pekin in Illinois.   Prior to working at FMC Devens, Segal worked at several other BOP facilities as a staff psychologist including FCC Oakdale, US Hazelton, and MDC Brooklyn.

As the Acting Warden at the time of the incident, and now a Warden at FCI Pekin, Segal is

---

[7]Segal left BOP in 2007 to work for U.S. Courts from 2007 to 2012 but went back to BOP in 2012.

also intimately familiar with BOP's use of force policy, the differences between an immediate and calculated use of force and can provide example of situations where force is authorized and appropriate.[8]  Segal also has a doctorate in clinical psychology and is particularly knowledgeable about the challenges involving inmates with mental health conditions.

In addition to providing testimony about his direct interactions with Lavorato and his observations of KT's injuries, Segal will testify about his direct involvement in the After-Action-Review of the use of force on KT.  Prior to that review, Segal had been previously involved in the After-Action-Review of hundreds of cases and is extremely knowledgeable about BOP procedures for documenting and reviewing a use of force incident in an After-Action-Review.

Dr. Brett Dodd, Jr.

At the time of the incident, Dr. Dodd was a Staff Psychologist in the Mental Health Unit ("MHU") at FMC Devens.  Dr. Dodd is currently a Behavioral Health Clinical Consultant with the Health Services Corps for Immigration and Customs Enforcement.  Prior to joining FMC Devens in late 2018, Dr. Dodd was also a Staff Psychologist at the FCI in Cumberland, Maryland for over 3 years.

While Dr. Dodd worked and consulted with a team of medical professionals in managing inmate KT's care, Dr. Dodd had substantial direct interactions with KT, starting in December 2018,[9] and was the primary psychologist for inmate KT. Dr. Dodd will provide a mix of lay and expert testimony.  In his role as a Staff Psychologist, Dr. Dodd had personal interactions with inmate KT beginning in December 2018 and leading up the incident on June 18, 2019.

The government expects that Dr. Dodd will testify about KT's ability to communicate

---

[8]Some of the examples of the appropriate level of force are included in Segal's October 30, 2019 grand jury testimony, which is being disclosed along with this memorandum.
[9]Dr. Dodd's direct interactions with inmate KT were documented in various "Clinical Intervention-Clinical Contact" reports that were disclosed in automatic discovery.  The government has also provided the defendant with a copy of Dr. Dodd's and Dr. Kazim's curriculum vitae.

effectively, understand commands, as well as his overall level of cognitive functioning.  According to Dr. Dodd, KT was the most mentally impaired inmate at FMC Devens.  Although KT's behavior periodically improved, at the time of the incident, KT was not functional.  While KT often had outbursts, KT often appeared to be hallucinating and responding to internal stimuli and was not typically combative with staff or other inmates.  Furthermore, while it was occasionally noted in clinical encounter reports that KT had a history of assaultive behavior, that assaultive behavior was either self-harm or, at worst, occasional spitting on staff.

For example, in clinical encounters that Dr. Dodd had with inmate KT in late December 2018, Dr. Dodd reported that KT "would not verbally or nonverbally respond to my attempts at interaction"; he appeared "to be hallucinating and or delusional" and was "functioning poorly on a daily basis."  By early January 2018, KT's condition improved but only to the extent that he could recognize Dr. Dodd and speak calmly but "in a nonsensical and possibly delusional manner."

Dr. Dodd will testify that KT had occasional outbursts and aggressive behavior, but none that required any use of force or restraints.  For example, on February 6, 2019, while on the N-1 Mental Health Seclusion Unit, inmate KT became "loud and psychotic."  When Dr. Dodd tried to speak with inmate KT to calm him down, KT spat directly on Dr. Dodd's face.  Without using a use of force team, inmate KT allowed correctional officers to handcuff and escort him back to his cell.

To be sure, part of Dr. Dodd's testimony, though based on direct observations, will also involve specialized knowledge including testimony about how KT suffers from a "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder."[10]   In addition to his own observations of inmate KT, Dr. Dodd also became familiar with KT's medical history from his review of records,

---

[10]The reasoning and basis for this diagnosis is included in a case summary dated February 14, 2019.  *See* e.g., USAO_BOURGET_009205.

conversations with other medical care professionals directly involved in KT's care, and his own conversation with KT's adoptive mother about his past medications and a childhood traumatic brain injury.  See Fed.R.Evid. 703; 803(4).[11]

Part of Dr. Dodd's testimony will establish that inmate KT's severe mental illness was well-known within FMC Devens.  In February 2019, Dr. Dodd and other medical professionals struggled treating what Dr. Batool Kazim described as the most "complex and frustrating" case of her professional career.  According to Dr. Kazim, KT exhibited the "most alien and inhumane behavior" including eating his own feces.[12]  KT would often disrobe, draw with his own feces on the wall, and tear up his bed mattress.  KT's condition became so severe that in April 2019, the BOP filed a petition pursuant to 18 U.S.C. § 4245, arguing that KT was suffering from a mental disease or defect and required more intense medication and care.

Beginning in May 2019, KT's condition somewhat improved, and Dr. Dodd and other staff sought to transfer KT from N-1 (the fully locked down unit) to N-3 (the semi-locked down unit) but KT continued to exhibit challenging behaviors.  For example, while not assaultive to staff or other inmates, KT continued to tear up his mattresses, had yelling outbursts, tore off his clothes, and slept in his own urine.  Inmate KT was transferred to N-1 on June 18, 2019, the same day as the two use of force events that led to the indictment in this case.

Dr. Batool Kazim

Dr. Batool Kazim has been employed as a Staff Psychiatrist at FMC Devens since approximately October 2013 and has been a psychiatrist for more than 20 years.  Like Dr. Dodd's testimony, Dr. Kazim's testimony will be a combination of both lay and expert testimony.  At the

---

[11]A detailed accounting of Dr. Dodd's assessment is in an email to the medical team dated February 8, 2019.  See USAO_BOURGET_009193.

[12]The condition is known as "Coprophagia," eating one's feces, which is common is animals but rarely seen in humans.

time of the incident, Dr. Kazim was directly involved in inmate KT's care and would see KT several times each week.  On several occasions, Dr. Kazim was able to calm KT down when KT was spitting on staff and refusing to cooperate with their instructions.

According to Dr. Kazim, because of his psychological and cognitive conditions, KT could not follow simple commands.  Dr. Kazim described KT as having the brain functions of a small child due to medical trauma as a child, and psychological issues such as schizophrenia and possibly dementia.  Dr. Kazim was also intimately involved with seeking a resolution to KT's coprophagia behavior, and as a medical doctor and psychiatrist, prescribed KT's various medications over the course of his treatment.

## Legal Standard

### Expert Testimony under Rule 702

Rule 702 imposes three basic requirements for the admission of expert testimony: (1) the expert must be qualified to testify, by "knowledge, skill, experience, training, or education"; (2) the testimony must concern "scientific, technical or other specialized knowledge"; and (3) the testimony must be such as to "assist the trier of fact to understand the evidence or to determine a fact in issue." United States v. Corey, 207 F.3d 84, 88–89 (1st Cir. 2000); Fed. R. Evid. 702(a). Under the Supreme Court's decision in Daubert, the trial court must also act as gatekeeper to ensure expert testimony is both reliable and relevant. United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999); see also United States v. Sandoval, 6 F.4th 63, 83 (1st Cir. 2021). (Daubert applies to the admission of expert testimony about "nonscientific evidence"). The First Circuit has also made clear that "[t]here is no particular procedure that the trial court is required to follow in executing its gatekeeping function under Daubert." United States v. Phillipos, 849 F.3d 464, 471 (1st Cir. 2017) (internal quotation marks and citation omitted).

Rule 702 additionally requires that the: "testimony is based on sufficient facts or data," the "testimony is the product of reliable principles and methods" and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b-d). The district court's decision to admit or exclude purported expert testimony for abuse of discretion. United States v. Giambro, 544 F.3d 26, 32 (1st Cir. 2008); see also United States v. Ladd, 885 F.2d 954, 959 (1st Cir.1989) (district courts "enjoys leeway in deciding to admit or exclude expert testimony").

   *1. The Witnesses are Qualified*

Here, each of the witnesses described above are qualified and competent to provide expert testimony. Dr. Dodd and Dr. Kazim are licensed, and experienced doctors and medical professionals employed in their fields. Leach, Bollinger, and Segal each have decades of experience in corrections. The First Circuit has consistently permitted expert testimony from law enforcement witnesses whose specialized knowledge is based on their training and experience. See e.g., United States v. Martinez-Armestica, 846 F.3d 436, 444 (1st Cir. 2017) ("We have recognized that in the law enforcement field an expert's experience and training bear a strong correlation to the reliability of the expert's testimony") (internal citations and quotations omitted); United States v. Sandoval, 6 F.4th 63, 84 (1st Cir. 2021) (upholding of expert testimony about the organization structure of MS-13); United States v. Martinez-Armestica, 846 F.3d 436, 444 (1st Cir. 2017) (upholding firearms tool mark expert who analysis required the knowledge of the characteristics of thousands of firearms); United States v. Pena-Santo, 809 F.3d 686, 694 (1st Cir. 2015) (upholding expert testimony on the "mode of the transportation of drugs" by experienced law enforcement agent); see also Fed. R. Evid. 702 advisory committee note to the 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

More particular to this case, the reliability of expert use of force testimony from qualified law enforcement officers has also been well established.  See e.g., United States v. Mohr, 318 F.3d 613, 623-24 (4th Cir.2003) (admitting expert testimony on the reasonableness of the defendant's use of force when the expert did not observe the defendant's actions but instead gave his opinion in response to abstract questions); Rivera v. Ring, 810 Fed.Appx. 859, 863 (11th Cir. 2020) (finding use of force expert qualified in § 1983 action who holds multiple degrees in public administration and law enforcement, was a law enforcement officer for decades, has taught and trained new officers on the use of force since 1984).

### 2.   The Testimony is Based on Reliable Methods

The testimony about the proper use of force will not be based on unsupported guesswork, but instead will be on a well-recognized and reliable methodology.  First, as reflected in his report, Mr. Leach reviewed an exhaustive list of materials, including videos, witness statements, interview reports, incident reports, and policies.[13]  See e.g., Kerr v. Miami–Dade County, 856 F.3d 795, 809 (11th Cir. 2017) (use of force expert's testimony grounded in reliable principles and methods because witness reviewed officer statements, photographs, viewed scene of the incident, and read and reviewed the incident reports); See Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

Second, while Leach (as well as Bollinger and Segal) will not be testifying about the law or legal decisions, Mr. Leach's analysis and methodology applies the relevant factors set forth by the Supreme Court including the following: "(1) What was the legitimate need for the use of force? (2) What was the threat reasonably perceived by the officer(s)? (3) How much force was

---

[13]The materials Leach reviewed are detailed starting at page 7 of the report, Exhibit B.

used in relation to the need? (4) What efforts were made to temper the use of force? (5) What injuries did the inmate sustain? (6) What is the severity of the offense by the inmate? (6) Was the offender actively resisting?"[14] See Hudson v. McMillian, 503 U.S. 1, 7 (1992) and Graham v. Connor, 490 U.S. 386, 396 (1989).  Mr. Leach's analysis is thus grounded in reliable principles.

3.   *The Use of Force Testimony Involves Highly Specialized Knowledge that Will Assist the Jury in Understanding and Determining Facts at Issue*

Lastly, the proffered use of force expert testimony involves highly specialized knowledge that will properly assist the jury in understanding the evidence.  While Fourth Amendment street encounters maybe more commonplace, see e.g., United States v. Brown, 871 F.3d 532, 538-39 (7th Cir. 2017) (no expert testimony necessary when officer punched and kicked arrestee, a "textbook example of easily comprehensible facts") analyzing the conduct of correctional officers inside a federal prison is an inordinately more complex task for a jury.  See e.g., Turner v. Safley, 482 U.S. 78, 84–85 (1987) ("[r]unning a prison is an "inordinately difficult undertaking that requires expertise[.]").

First, BOP facilities are highly regulated, and the use of force inside their prisons is governed by a series of federal regulations, statutes, and BOP Program Statements.  See e.g., 28 C.F.R. § 552.20 et seq.; Program Statement 5566.06 ("Use of Force and Application of Restraints");[15] Program Statement 5500.12 ("Correctional Services Procedures Manual")[16].  While anyone can read policies and regulations, understanding how they are applied in a prison requires experience beyond that of a typical juror.  Testimony about a hierarchy of broadly worded statutes, regulations, and polices, and how prison officials are trained to interact with inmates is admissible and will assist the trier of fact.  See e.g., United States v. Galatis, 849 F.3d 455, 462

---

[14]Exhibit B, pg. 18.
[15]Program Statement 5566.06 is a publicly available document.  Available at: https://www.bop.gov/policy/progstat/5566_006.pdf
[16]Program Statement 5500.12 ("Correctional Services Procedures Manual") is not publicly available.

(1st Cir. 2017) (testimony of Medicare fraud investigator about the relationship between physicians and patients—and about the hierarchy among the statute, regulations, and policy manual—was admissible and based on her professional experience).

While the regulations are clear, they are also broadly worded. For example, under 28 C.F.R. § 552.20, BOP staff is authorized to use force:

> only as a last alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff, and others, to prevent serious property damage and to ensure institution security and good order.

> 28 C.F.R. § 552.20; Program Statement 5566.06

Program Statement 5566.06 goes on to state that "When force is used, it will be only the amount of force required to subdue an inmate, or preserve or restore institution security and good order." *Id.* (Program Objective, 2b).

The justification for force also depends on the situation.  Section 552.21 distinguishes between immediate and calculated uses of force.  With an immediate use of force, "[s]taff may immediately use force and/or apply restraints when the behavior described in § 552.20 constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order." 28 C.F.R. § 552.21(a).  In contrast, a calculated use of force:

> occurs in situations where an inmate is in an area that can be isolated (e.g., a locked cell) and where there is no immediate, direct threat to the inmate or others. When there is time for the calculated use of force or application of restraints, staff must first determine if the situation can be resolved without resorting to force (see § 552.23).

> 28 C.F.R. § 552.21(b).

Understanding the distinction between an immediate and calculated use of force in this case is particularly important.  While the initial use of force (the knee drop) in Count One arguably involved an immediate use of force, the second use of force in Count Two (the shield)

was not as defendant Lavorato stated, a continued immediate or emergency use of force.[17]
Instead, it was more properly a "calculated use of force" because there was "no immediate, direct
threat to the inmate or others." 28 C.F.R. § 552.20(c); see United States v. Jennings, 991 F.2d
725, 731 (11th Cir. 1993) (discussing calculated use of force regulation requirements).  Unlike an
immediate or emergency use of force, a calculated use of force requires more attempts at de-
escalation and consultation.

      Second, in addition to rules and regulations, the use of force inside a prison also involves
various tools and techniques that are generally unfamiliar to the average juror.  See e.g., Kopf v.
Skyrm, 993 F.2d at 379 (allowing expert witness on canine training because "[h]ow to train and
use a police dog are even more obscure skills").  How these skills and techniques should be
employed is particularly important to an understanding of the evidence in this case.

      By statute, regulation, and training, BOP correctional officers are permitted to use force
including OC spray, restraints, a shield, and in some situations even deadly force.  The issue in
this case will be *how* that force was used; whether the level of force was excessive or appropriate;
and whether it was done with a malicious and sadistic intent to unlawfully punish the inmate or
rather for a legitimate purpose (to protect and ensure safety, prevent serious property damage, or
maintain institution security and good order).  For this reason, understanding how correctional
officers should use a protective shield in accordance with correctional practices and BOP policy
and training is relevant to the issue of intent. See e.g., Serna v. Colo. Dep't of Corr., 455 F.3d
1146, 1152 (10th Cir. 2006) (Malicious, sadistic intent can also be inferred from the conduct itself
where there can be no legitimate purpose for the officer's conduct).  Evidence that a defendant
recklessly ignored use of force policy and training tends to show that the defendant had the

---

[17]Immediately prior to the entry into the cell, on camera Lavorato described the upcoming use of force as
("at this time we will continue this, ah, emergency use of force . . .") and in his report called it an
"immediate use of force."

subjective intent to cause harm and punish.  See United States v. McKeeve, 131 F.3d 1, 13 (1st Cir. 1997) ("When, as now, the prosecution offers evidence bearing on an inherently subjective inquiry, the relevancy threshold is at its lowest").

Finally, understanding the proper use of force in a correctional institutional also requires a comprehensive understanding of the general behavior and practices of prison inmates.  See e.g., United States v. Muro-Inclain, 597 Fed.Appx. 936, 938 (9th Cir. 2015) (Expert witness testimony upheld when witness "offered an opinion on the general behavior and practices of inmates based on his specialized knowledge").  Determining exactly what kind of force is necessary to gain control of an inmate logically requires some understanding of how inmates will typically react. Testimony about how much force is necessary to control an inmate very much depends on experience rather empirical studies and is reliable testimony.  See e.g., United States v. Alzanki, 54 F.3d 994, 1006 (1st Cir. 1995) (testimony about the victims of sexual abuse patterns and behavior's reasonably likely to assist jury and admissible); United States v. Mallory, 902 F.3d 584, 593 (6th Cir. 2018) ("while handwriting analysis may not boast the 'empirical' support underpinning scientific disciplines, it is nevertheless 'technical' or 'specialized' knowledge that, subject to thorough gatekeeping, is a proper area of expertise"). As Mr. Leach explains in his report, the level of force required also includes a consideration of "whether the inmate has the means to carry out a given threat or behavior."[18]

In this regard, Mr. Leach will be able to competently testify about the different kinds and levels of threats to others and institutional security, how correctional officers are trained to respond, and how inmates typically respond to their actions.  Without this context, gauging whether the defendant's actions in this case crossed the line into constitutional excessiveness will

_____

[18]Exhibit B page 20.

be more difficult for a jury to appreciate and fairly measure.  See e.g., United States v. Teganya,
997 F.3d 424, 430 (1st Cir. 2021) (upholding admission of expert testimony about Rwandan
genocide and its aftermath for "context and background").

> 4.  *The Use of Force Testimony is Relevant and Will Avoid any Legal Conclusions or Opinion about the Defendant's State-of-Mind*

First, testimony that Bourget's use of force was inconsistent with modern correctional
standards and BOP use of force policy is relevant to prove "willfulness," an essential element of
the offenses charged in Counts One and Two, in violation of 18 U.S.C. § 242. Among other
elements, Counts One and Two requires the government to prove that Bourget "willfully"
deprived inmate KT of his right to be free from "cruel and unusual punishment."[19]  While the
Eighth Amendment permits force used "in a good-faith effort to maintain or restore discipline" it
bars force applied "maliciously and sadistically to cause harm[]" (Hudson, 503 U.S. at 7) and
protects prisoners from the "unnecessary and wanton infliction of pain" (Whitley v. Albers, 475
U.S. 312, 319–20 (1986)) and those "totally without penological justification." Rhodes v.
Chapman, 452 U.S. 337, 346 (1981) (internal citations omitted).  A prosecution under § 242
requires the government to prove both an objective violation of the Eighth Amendment - by
showing that the conduct in fact was "harmful enough" - as well as Bourget's subjective intent to
willfully deprive KT of that right.  Hudson, 503 U.S. at 8 (quoting Wilson v. Seiter, 501 U.S. 294,
298 (1991))

Furthermore, the cases make clear that a malicious, sadistic intent can be inferred from the
conduct itself where there can be no legitimate purpose for the officer's conduct. Serna, 455 F.3d
at 1152; see Pereira v. Clarke, 2010 WL 4181387, at *2 (DMass-2010) (plausible inference of
sadistic intent when correctional officers punched and kicked inmate while he was naked and

---

[19]The Eighth Amendment to the U.S. Constitution provides, "Excessive bail shall not be required, nor
excessive fines imposed, nor cruel and unusual punishments inflicted."

defenseless before handcuffing him and ramming his head into a door and wall with such force that he was knocked unconscious); see also United States v. Sorrentino, 726 F.2d 876, 880 (1st Cir. 1984) (in tax prosecution, jury can infer willfulness from underreported income couple with conduct by the defendant tending to mislead or conceal). In the criminal civil rights context, "[w]illfulness can be inferred from 'plainly' wrongful conduct, inconsistency between actions and training, and efforts to prevent detection of wrongful behavior[.]" United States v. Brown, 654 Fed.Appx. 896, 910 (10th Cir. 2016) (internal citations omitted).  Therefore, testimony from a competent reliable expert like Mr. Leach that Bourget's use of force on inmate KT with a shield (Count Two) was inconsistent with modern correctional standards and BOP use of force training and policy is highly relevant to prove the defendant's willfulness.

Notably, in a civil action filed under 42 U.S.C. § 1983,[20] a district court permitted this same expert witness, Mr. Donald Leach, to testify about "what routine and acceptable correctional practices in jails are, based on his training and expertise as a correctional administrator and instructor" and "whether using [a] particular restraint was appropriate in the circumstances presented, under recognized standards and practices for jail administration." Peters v. Woodbury County, Iowa, 979 F.Supp.2d 901, 925 (N.D.Iowa-2013).  In this way, the government is seeking to use Mr. Leach as a witness in the same manner he has previously been permitted to testify in federal court.

Second, Mr. Leach will not provide a legal conclusion or simply opine that Bourget's use of force was "excessive" as those words are alleged in the indictment.  See e.g., United States v. Eberle, 2008 WL 4858438, at *3 (E.D.Mich-2008) (ruling that expert witness would be precluded from expressing opinion that defendant's conduct amounted to "excessive force" but permitting

---

[20] United States v. Cobb, 905 F.2d 784, 788 n. 6 (4th Cir.1990) ("Because 18 U.S.C. § 242 is merely the criminal analog of 42 U.S.C. § 1983, and because Congress intended both statutes to apply similarly in similar situations, our civil precedents are equally persuasive in this criminal context").

testimony about training, the continuum of force generally, whether defendant's conduct violated specific standards or practices, and whether the specific actions were warranted); United States v. Mohr, 318 F.3d 613, 624–25 (4th Cir. 2003) (upholding expert witness testimony that defendant's use of police dog "was not in accordance with prevailing police practices" and offered to rebut testimony that defendant's conduct was consistent with her training and was reasonable based on various factors); Caldwell v. District of Columbia, 201 F.Supp.2d 27, 37 (D.D.C.-2001) ("an expert with specialized knowledge in an area such as corrections may testify about accepted practice in the field"). Rather, Mr. Leach will testify that Bourget's use of force was not an acceptable correctional use of force, was not in concert with modern correctional standards, and violated BOP policy.[21]  Furthermore, while Mr. Leach's testimony will be focused on the second use of force charged in Count Two, with regards to Count One (the knee drop), Mr. Leach will testify that there is no legitimate governmental reason for dropping a knee on an inmate's head.

While a seemingly slight distinction that is "measured in inches, not feet[]" United States v. Perkins, 470 F.3d 150, 159–60 (4th Cir. 2006), the case law makes clear that the difference between calling something "excessive" versus "inappropriate" or "without justification" is a legally meaningful difference and sufficient for admissibility.  See Id. at 159–60 (upholding officer testimony that there was there was "no law enforcement" or "legitimate" reason for kicking an arrestee, the testimony was admissible because it was not defined in "reasonableness" legal terms).  Furthermore, though Fed. R. Evid. 704(b) prohibits a government witness from opining about a defendant's mental state, this bar does not "apply to predicate facts from which a jury might infer such intent." United States v. Henry, 848 F.3d 1, 11–12 (1st Cir. 2017) (internal citations and quotations omitted).  Following this requirement, Mr. Leach's testimony (as well as

---

[21]See Exhibit B, pg. 39.

the testimony of Bollinger and Segal) will avoid any speculation regarding the defendant's intent in striking inmate KT with the shield.

5. *The Use of Force Testimony is Also Admissible Against Defendant Joseph Lavorato*

The above-described testimony that tends to show that Bourget's use of force was excessive and done for an improper purpose is also relevant against defendant Joseph Lavorato who is charged with falsifying a report and obstructing the investigation into Bourget's use of force in Count Three (corrupt obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2)) and Four (destruction and falsification of records, 18 U.S.C. § 1519).

First, while not charged with any excessive use of force, on the evening of June 18, 2019, Lavorato was the Lieutenant in charge of FMC Devens and was responsible for supervising, and reporting on, the second use of force on inmate KT.  Testimony and evidence that the use of force was unlawful and excessive is compelling evidence that Lavorato's material inaccuracies in his reporting was not a mistake, but instead was intentional obstructive conduct to cover up for his own lack of diligence.  Even if Lavorato did not encourage or instruct Bourget to use excessive force, the fact that Bourget did cross the line, and Lavorato knew that he was responsible for what occurred, establishes the existence for an improper motive and a logical reason for Lavorato's conduct. The evidence is also inextricability intertwined with Lavorato's false reporting and cannot be said to be unfairly prejudicial under Rule 403. See e.g., United States v. Sabean, 885 F.3d 27, 38 (1st Cir. 2018) (upholding admission of evidence that defendant sexually abused his daughter as motive to supplying her with bogus subscriptions even though "a meaningful danger of unfair prejudice lurked").

Second, § 1512(c)(2) also requires proof of an "official proceeding" and a factual nexus between the defendant's conduct and the official proceeding.  See United States v. Aguilar, 515 U.S. 593, 599 (1995) ("the act must have a relationship in time, causation, or logic with the

judicial proceedings"). Bollinger and Segal's testimony about the After-Action Review is evidence of that official proceeding. United States v. Perez, 575 F.3d 164, 168–69 (2d Cir. 2009) (a BOP After-Action Review of a use of force is an "official proceeding" under 1512(c)(2)).

Count Four charges Lavorato with a violation of § 1519 in two ways.  First, it alleges that Lavorato falsified his 583 Report (Use of Force Report) by claiming that the first camera used to record the use of force "failed due to a dead battery."  Second, it alleges that Lavorato purposely failed to include the recording in his submission and that he deleted the video or at least caused it to be deleted.  While different than Count Three, Count Four requires the government to prove that in falsifying the report and leaving out the deleted video, Lavorato intended to impede, obstruct, or influence a contemplated investigation.  Bollinger and Segal will provide testimony that there was an investigation and After-Action-Review after each use of force, that the investigation includes a detailed review of all the reports and videos that the lieutenant in charge submits for review.

6. *Testimony About Inmate KT's Level of Functionality and Ability to Communicate is Relevant and Admissible*

As summarized above, both Dr. Dodd and Dr. Kazim will testify about their personal interactions with inmate KT from December 2018 leading up to around the time of the incident. While most of this testimony is rationally based on their own perceptions under Rule 701, they will also testify from the perspective of a licensed psychologist and psychiatrist working at BOP and will offer an opinion about the severity of inmate KT's mental illness and condition.

The testimony is relevant for three reasons.  First, the evidence will demonstrate that inmate KT was not a threat to anyone and that the true reason for Bourget's use of the shield was to punish inmate KT for spitting on Bourget and other correctional officers.  While various reports

indicated that inmate KT was "assaultive,"[22] Dr. Dodd and Dr. Kazim will clarify that the assaultive behavior was limited to spitting and self-harm and that they were consistently able to obtain KT's compliance without any use of force.  Second, the fact that inmate KT was unable to consistently communicate and understand simple commands demonstrates that force was not necessary.  This was not the case of a recalcitrant, belligerent inmate.  Inmate KT's inability to immediately adhere to Lavorato's commands to laydown (while he was cuffed behind his back) did not justify a use of force to decontaminate KT from the effects of the OC spray (in essence, to wash his face).

Third, inmate KT's severe mental illness demonstrates that the two uses of force on KT were "harmful enough" and offends "contemporary standards of decency" to constitute a violation of the Eighth Amendment. Sconiers v. Lockhart, 946 F.3d 1256, 1265–66 (11th Cir. 2020) (quoting Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)).  Unlike a typical inmate, KT was unable to communicate or coherently complain.[23]  Evidence that Bourget struck a severely mentally impaired, handcuffed inmate with so much force that the inmate needed eleven staples in his head is relevant evidence to demonstrate the conduct offended "contemporary standards of decency." See Hudson, 503 U.S. at 9-10 (1992) (Eighth Amendment claims must be evaluated in light of "society's expectations" and, thus, that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... whether or not significant injury is evident").

---

[22] One clinical encounter report from Dr. Dodd states that KT, "has been inconsistently cooperative with correctional and nursing staff but at time assaultive. The inmate's mood appears to be unstable and he is presenting as floridly psychotic. He has been unable to report on current plans or intentions to harm himself and expresses no future oriented or concerned for his well being."

[23] After the incident, when interviewed by investigators and was more coherent and medicated, KT recalled the incident, but said that the injury was a result of him cursing, a cat under his pillow biting his lip, and said his imagination sometimes got the best of him.

<u>The Testimony of Bollinger, Segal, Dr. Dodd and Dr. Kazim is Also Admissible as Lay Testimony under Rule 701</u>

While Mr. Leach will be testifying under Rule 702, the remaining witnesses will be providing testimony primarily under Rule 701.  As the First Circuit and Rule 701 makes plain, "all Rule 701 requires is that the testimony in question be 'rationally based on the perception of the witness,' [is] 'helpful to ... the determination of a fact in issue,' and [is] 'not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" <u>United States</u> v. <u>Belanger</u>, 890 F.3d 13, 28 (1st Cir. 2018) (<u>quoting</u> Fed.R.Evid. 701).  Lay testimony may also include opinion testimony. <u>See</u> <u>United States</u> v. <u>Garcia</u>, 994 F.2d 1499, 1504 (10th Cir. 1993) ("opinion testimony is not limited to experts."). "Rule 701 . . . is meant to admit testimony based on lay expertise a witness personally acquires through experience, often on the job." <u>United States</u> v. <u>Maher</u>, 454 F.3d 13, 24 (1st Cir. 2006).  Within the context of an excessive force criminal prosecution, several cases demonstrate that the testimony of officers who participate and observe a use of force are competent witnesses to testify about whether, based on their training and experience, the force was justified under the circumstances.

<u>United States</u> v. <u>Brown</u> involved testimony from a defendant's fellow correctional officers that the defendant's use of force was contrary to their training and "inconsistent with what they been taught." <u>Brown</u>, 654 Fed.Appx. at 905.  The Tenth Circuit upheld the testimony ruling that the witnesses "simply testified about what they were taught and what they subsequently witnessed: they were taught not to use force when an inmate poses no threat, but they later witnessed force being used on calm inmates who were in restraints and who posed no threat." <u>Id</u>. at 905.  In <u>United States</u> v. <u>Smith</u>, the Seventh Circuit upheld the testimony from officers that witnessed the defendant assault two arrestees and who testified that the defendant's use of force was unjustified because the arrestees were not resisting. <u>Smith</u>, 811 F.3d at 909.  The Court

further stated that it would have been "absurd" to have required the officers to be qualified as experts and concluded that anyone who observed what the defendant did would have been able to offer an opinion.  Finally, in <u>United States</u> v. <u>Perkins</u>, the Fourth Circuit upheld the testimony of a defendant's fellow officers under Rule 701 who observed the defendant kick an arrestee and testified that they personally saw "no law enforcement reason" for the defendant's kicks.  <u>Id</u>. at 470 F.3d at 159-60.

At trial, the government anticipates that several witnesses, including other officers who participated in the calculated use of force charged in, Count Two, will describe Bourget's use of force as excessive, inconsistent with their training, and that the video (which was later deleted) looked "bad."  <u>See</u> <u>Smith</u>, 811 F.3d at 909 ("The officers did offer some opinion evidence, mainly that [defendant] had used excessive, unreasonable force against [the arrestees], but that evidence was not based on 'scientific, technical, or other specialized knowledge' of the sort that only a witness whom the judge had qualified to be an expert witness would be allowed to testify to").

The testimony is admissible under Rule 701 because like the testimony the Tenth Circuit upheld in <u>Brown</u>, the officers' testimony will be based on what they were taught, and their observations about the threat and resistance from inmate KT.  <u>Brown</u>, 654 Fed.Appx. at 905. That testimony becomes even more relevant if the defendant advances a defense like what he told the agent who arrested him on the indictment: that he was "trained" to enter a cell with as much force as possible and that his aggressive manner in the use of force was used a model and in a training video for other correctional officers.

<u>Conclusion</u>

Accordingly, the government submits the foregoing memorandum and notice regarding testimony under 702 of the Federal Rules of Evidence and Federal Rule of Criminal Procedure 16(a)(1)(G).

Respectfully submitted,

NATHANIEL R.  MENDELL
Acting United States Attorney

By:     /s/ *Neil Gallagher*
        Neil J. Gallagher, Jr.
        Torey E. Cummings
        Assistant U.S. Attorneys

Date Submitted:  December 23, 2021

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Neil J. Gallagher, Jr.*
Neil J. Gallagher, Jr.